IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHLOE L. WRAY,                                    06-CV-492-BR

                    Plaintiff,                    OPINION AND ORDER

v.

MICHAEL J. ASTRUE,[1]
Commissioner of Social Security
Administration,

                    Defendant.


**TIM WELLBORN**
Wellborn & Associates, PC
2020-C S.W. 8th Avenue
West Linn, OR 97068
(503) 697-7019

          Attorneys for Plaintiff

_____

          [1] On February 12, 2007, Michael J. Astrue became the
Commissioner of Social Security and, therefore, is substituted as
the Defendant in this action pursuant to Fed. R. Civ. P. 25(d)(1)
and 20 U.S.C. § 405(g).

**KARIN J. IMMERGUT**
United States Attorney
**NEIL J. EVANS**
Assistant United States Attorney
1000 SW. Third Avenue, Suite 600
Portland, OR 97204-2904
(503) 727-1053

**MICHAEL McGAUGHRAN**
Office of the General Counsel
**FRANCO L. BECIA**
Special Assistant United States Attorney
Social Security Administration
701 5th Avenue, Suite 2900, M/S 901
Seattle, WA 98104-7075
(206) 615-2545

        Attorneys for Defendant


**BROWN, Judge.**

    Plaintiff Chloe L. Wray seeks judicial review of the Social

Security Commissioner's final decision denying her application

for Disability Insurance Benefits (DIB) under Title II of the

Social Security Act.

    This Court has jurisdiction to review the Commissioner's

decision under 42 U.S.C. §§ 405(g) and 1383(c).  Following review

of the record, the Court **REVERSES** the Commissioner's final

decision and **REMANDS** this matter for further administrative

proceedings consistent with this Opinion and Order.


                <u>BACKGROUND</u>

    Born in 1953, Wray attended one year of college.  Tr. 68,


2  -  OPINION AND ORDER

83.[2]  Wray reports she worked as a bookkeeper between an
unspecified date and March 1995.  Tr. 78.  Wray asserts she has
been disabled and unable to work due to multiple sclerosis since
March 2, 1995.  Tr. 68, 77.  She states her multiple sclerosis
causes migraine headaches, exhaustion, dizziness, pain, numbness,
and chills as well as loss of vision, concentration, and balance.
Tr. 77.


## ADMINISTRATIVE HISTORY

    Wray applied for DIB on December 14, 2002.  Tr. 70.  Her
application was denied initially and on reconsideration.  Tr. 22-
26, 28-30.  On January 4, 2005, a hearing was held before an
Administrative Law Judge (ALJ).  Tr. 391-433.

    The ALJ subsequently issued an undated decision that was
unfavorable to Wray.  Tr. 14-17.  That decision became the final
decision of the Commissioner on February 10, 2006, when the
Appeals Council denied Wray's request for review.  Tr. 6-8.


## MEDICAL BACKGROUND

    The medical record shows Wray visited her treating
physicians between 1992 and 2000 seeking treatment for headaches,

---

    [2] Citations to "Tr." refer to page(s) indicated in the
official transcript of the administrative record filed with the
Commissioner's Answer.

depression, eye pain, and fatigue.  Tr. 244-59.  In January 2001, an MRI of Wray's brain showed white lesions.  Tr. 267.  The associated diagnostic report indicated these lesions as well as Wray's ongoing symptoms were consistent with multiple sclerosis. Tr. 173, 267.  In April 2002, Wray's neurologists formally diagnosed her multiple sclerosis via longitudinal comparative MRI studies and spinal fluid testing.  Tr. 156.  Wray's condition has since deteriorated.

## DISABILITY ANALYSIS

The Commissioner engages in a sequential process encompassing between one and five steps to determine disability under the meaning of the Act.  20 C.F.R. § 404.1520(a).  *See also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  Wray challenges the ALJ's evaluation of the evidence, her findings at Step Two, and her determination that Wray is not disabled.

At Step One, the ALJ determines whether the claimant is performing substantial gainful activity.  If she is, the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(i).

At Step Two, the ALJ determines whether the claimant has "a severe medically determinable physical or mental impairment" that meets the twelve-month duration requirement.  20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii).  If the claimant does not have a

4  -  OPINION AND ORDER

severe impairment, she is not disabled.  *Id.*

At Step Three, the ALJ determines whether the severe impairment meets or equals a "listed" impairment in the regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If the impairment meets or equals a listed impairment, the claimant is disabled.

If adjudication proceeds beyond Step Three, the ALJ must first evaluate the medical and other relevant evidence to assess the claimant's residual functional capacity (RFC).  The claimant's RFC is an assessment of work-related activities that the claimant may still perform on a regular and continuing basis despite limitations imposed by her impairments.  20 C.F.R. § 404.1520(e).  *See also* Social Security Ruling (SSR) 96-8p.

At Step Four, the ALJ must determine whether the claimant retains the RFC to perform work that he has done in the past.  20 C.F.R. § 404.1520(a)(4)(iv).

If the claimant cannot perform past relevant work, the ALJ must determine at Step Five whether the claimant can perform other work in the national economy.  *Yuckert*, 482 U.S. at 146 n.5.  *See also Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999); 20 C.F.R. § 404.1520(a)(4)(v).

The initial burden to establish disability rests with the claimant.  *Tackett*, 180 F.3d at 1098.  If the ALJ reaches Step Five, the burden shifts to the Commissioner to show that jobs

exist in the national economy that the claimant can do. *Tackett*,
180 F.3d at 1098.  If the Commissioner meets this burden, the
claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1566.


## ALJ'S FINDINGS

At Step Two in the sequential proceedings, the ALJ found
"the medical evidence of record reveals the claimant did not have
a severe medically determinable impairment or impairments lasting
for twelve continuous months on or before September 20, 2000."
Tr. 17.  The ALJ also found "the claimant's statements concerning
her limitations and their impact on her ability to work are not
credible in light of the objective medical evidence and the
testimony of the medical expert."  Tr. 17.  The ALJ, therefore,
concluded Wray was not disabled at any time through the date of
the ALJ's decision.  Tr. 17.


## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision
if the Commissioner applied proper legal standards and his
findings are supported by substantial evidence in the record.
42 U.S.C. § 405(g).  *See also Batson v. Comm'r for Soc. Sec.
Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).  The court must weigh
"both the evidence that supports and detracts" from the  ALJ's

conclusion.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.

1989).  The reviewing court "may not substitute its judgment for

that of the Commissioner." *Edlund v. Massanari*, 253 F.3d 1152,

1156 (9th Cir. 2001).  When reviewing a credibility finding, the

court must consider whether the Commissioner provided "clear and

convincing reasons" for finding a claimant was not credible.

*Reddick v. Chater*, 157 F.3d, 715, 722 (9th Cir. 1998).  Variable

interpretations of the evidence are insignificant if the

Commissioner's interpretation is a rational one.  *Magallanes*, 881

F.2d at 750.  *See also Batson*, 359 F.3d at 1193.


## DISCUSSION

Wray contends the ALJ erred at Step Two when she found Wray

"did not have a severe medically determinable impairment or

impairments lasting for twelve continuous months on or before

September 20, 2000." Wray also contends the ALJ erred by

improperly rejecting medical-source opinions and by improperly

finding Wray's testimony not credible.  Wray asserts her

testimony and the medical-source opinions rejected by the ALJ

should be credited, and, based on that evidence, she should be

deemed disabled.

I.   **The ALJ's Step-Two Analysis**

    A.   **Step-Two Evaluations**

As noted, the ALJ determines at Step Two whether the claimant has a "severe" impairment.  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is "severe" if it "significantly limits" the claimant's ability "to do basic work activities."  20 C.F.R. §§ 404.1520(c), 404.1521.  Such an impairment must last or be expected to last for twelve months. 20 C.F.R. § 404.1509.  The onset of the impairment must precede the claimant's date last insured for DIB.  20 C.F.R. § 404.404.131.  Step Two determinations are only "de minimis" screenings.  *Yuckert*, 482 U.S. at 153 (1987).

In previous rulings, the Commissioner has explicitly addressed the evaluation of a claimant's onset date and impairments with nontraumatic origins.  *See* SSR 83-20 (1983 WL 31249, at *2).  "Factors relevant to the determination of disability onset include the individual's allegations, the work history, and the medical evidence."  *Id.*, at *1.  This is the "starting point in determining the date of onset of disability." *Id.*, at *2.  The claimant must show her disabling condition began before her date last insured, which, in this case, is September 30, 2000.  *See* 20 C.F.R. § 404.101.  *See also* Tr. 71. A claimant's work history "is frequently of great significance in

selecting the proper onset date." SSR 83-20 (1983 WL 31249, at *2).

"Particularly in the case of slowly progressive impairments, *it is not necessary for an impairment to have reached listing severity* (*i.e.*, to be decided on medical grounds alone) *before onset can be established*. In such cases, consideration of vocational factors can contribute to the determination of when the disability began." *Id.* (emphasis added). The Commissioner gives specific instructions for the process that should be followed when inferring the onset date of a progressive disease:

> When an onset date is inferred from the medical evidence, the available medical evidence should be considered in view of the nature of the impairment (i.e. what medical presumptions can reasonably be made about the course of the condition). The onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months or result in death. Convincing rationale must be given for the date selected.

*Id.,* at *3.

The Ninth Circuit also addresses the issue of evidence produced after a claimant's insured status expires: "Reports containing observations made after the period for disability are relevant to assess the claimant's disability." *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988). The Smith court explicitly

9 - OPINION AND ORDER

found "medical evaluations made after the expiration of a claimant's insured status are relevant to the evaluation of the pre-expiration condition." *Id.*

Here the ALJ failed at Step Two to consider adequately the retrospective opinions of Wray's treating physicians regarding Wray's earlier symptoms that were later attributed to the pre-existing condition of multiple sclerosis.

**B.    Medical-Source Opinions**

**1.    Standards**

Generally a treating physician's opinion is accorded greater weight than that of an examining physician, and an examining physician's opinion is, in turn, accorded greater weight than that of a nonexamining or reviewing physician. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  If the opinion of a treating or examining physician is contradicted, the ALJ must give specific and legitimate reasons supported by substantial evidence in the record for rejecting it.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).  The ALJ's analysis must include a "detailed and thorough summary of the facts and conflicting clinical evidence." *Magallanes*, 881 F.2d at 751. Finally, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a

treating physician." *Lester*, 81 F.3d at 831.

####     2.    David Cobasko, M.D., Treating Physician

Dr. Cobasko, a neurologist, treated Wray between January 2001 and August 2004.  Tr. 147-75, 295-303.

Dr. Cobasko evaluated Wray in January 2001 for her complex headache complaints.  Tr. 170.  A concurrent MRI showed white-matter abnormality. Tr. 170.  Although he noted these abnormalities were "nonspecific," Dr. Cobasko believed they raised the question of multiple sclerosis and might actually indicate multiple sclerosis.  Tr. 170.  Dr. Cobasko's clinical examination of Wray indicated she was neurologically intact, but he emphasized that Wray exhibited "mild transient imbalance." Tr. 171-72.

As noted, Dr. Cobasko suggested Wray's clinical presentation could indicate multiple sclerosis:

> The possibility of diagnostic lumbar procedure was discussed.  I view this as a discretionary procedure at this point.  Were she to have symptoms and signs more indicative of multiple sclerosis, it would be a good thing to do. Lacking these, as she has so far, I would simply have her monitor the symptoms accordingly. Although MRI is often poor when it comes to diagnostic specificity, it is excellent at assessing interval progression of disease, and a follow-up MRI study in a year could be very interesting . . . . Multiple sclerosis is usually a progressive disease, and this could sway the balance one way or the other.

Tr. 173-74.

11  -  OPINION AND ORDER

In her opinion, the ALJ stated

> the abnormal finding of the brain upon magnetic
> imaging would only indicate exceedingly mild
> disease.  Dr. Cobasko also noted the claimant had
> only four weeks of headache discomfort prior to
> his evaluation; by February 2001, the claimant's
> headaches were significantly better with
> medication; and that she has a few days of being
> headache free.

Tr. 15.  In his report, however, Dr. Cobasko did not indicate any
potential multiple sclerosis would be "exceedingly mild."

The ALJ's emphasis on Wray's headache improvement is
also misplaced.  As noted, the ALJ rejected Dr. Cobasko's opinion
in part because she found Wray's headaches improved after Wray
began treatment with Dr. Cobasko.  Tr. 15.  Dr. Cobasko's notes
indicate Wray's headaches did not disappear in February 2001, and
he diagnosed Wray as suffering from migraines throughout the
period that he treated her.  Tr. 149-60, 164,.  Dr. Cobasko's
January 2001 examination also established the beginning of Wray's
treatment for multiple sclerosis.  Tr. 170.

Dr. Cobasko's subsequent treatment of Wray confirmed
a multiple-sclerosis diagnosis.  Tr. 149-69.  Dr. Cobasko
made a formal diagnosis in April 2002 and indicated this
diagnosis "explains a number of [Wray's] ongoing symptoms.
In particular, nearly all multiple sclerosis patients suffer
severe, innervating fatigue which often limits employability."
Tr. 155.  Dr. Cobasko's notes also establish Wray's condition is

12  -  OPINION AND ORDER

progressive.  Tr. 147, 183, 295, 297, 299.  In summary,
Dr. Cobasko's opinion establishes Wray's symptoms reported prior
to her September 30, 2000, date last insured are attributable to
multiple sclerosis.  The ALJ, however, rejected Dr. Cobasko's
opinion.

On this record, the Court concludes the ALJ erred when
he failed to give legally sufficient reasons supported by
substantial evidence in the record for rejecting Dr. Cobasko's
opinion.

### 3.  Christopher J. Ginocchio, M.D., Treating Physician

The treatment relationship between Wray and Dr. Cobasko
ceased when Dr. Cobasko closed his Oregon practice and moved out
of state in August 2004.  Tr. 340, 345.  Dr. Ginocchio, a
neurologist who was Dr. Cobasko's partner, assumed the care of
Wray.  For this reason, the Court construes Wray's treatment
relationship with Dr. Ginocchio as an extension of her treatment
relationship with Dr. Cobasko.

Dr. Ginocchio's clinical notes reflect Wray's multiple
sclerosis was progressive and that Wray continued to experience
migraines.  Tr. 343.  Dr. Ginocchio also stated in his history of
Wray's "present illness" that Wray has had "approximately ten
years of intermittent but worsening balance problems, sensitivity
to light and fatigue with a few years of decreased cognitive

abilities including memory."  Tr. 340.

The ALJ failed to consider Dr. Ginocchio's opinion. Although an ALJ is not required to consider "insignificant or nonprobative" evidence, *Howard v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003), this standard does not apply to Dr. Ginocchio's opinion regarding Wray's symptoms experienced prior to her date last insured and her delayed formal diagnosis.

The Court, therefore, finds on this record that the ALJ erred when he failed to give legally sufficient reasons supported by substantial evidence in the record for failing to consider Dr. Ginocchio's opinion.

### 4.  Stephen Nicholson, M.D., Treating Physician

Dr. Nicholson, a general physician, coordinated Wray's care with Drs. Cobasko and Ginocchio.  In August 2004, Dr. Nicholson submitted a letter for the record in which he stated:

> Wray's symptoms started long before [2002] and her disease process proceeded her formal diagnosis by several years.  Because of her symptoms she was unable to work from 1995 on.  It is not uncommon for patients to have MS and not carry a diagnosis but have life altering symptoms for several years prior to actual diagnosis and this is clearly what happened to Ms. Wray.

Tr. 303, 346.

Although the ALJ noted this letter, she concluded Dr. Nicholson's "statements cannot be given controlling weight, even

though he is a treating source.  His statements are essentially
conclusions as to disability rather than medical opinions about
specific functional limitations."  Tr. 16.  The ALJ also stated

> Dr. Nicholson's opinions are not adequately
> supported by medically acceptable clinical and
> laboratory diagnostic techniques.  For example,
> magnetic imaging of the brain in 2001 revealed
> only slight abnormalities and Dr. Cobasko reported
> such abnormalities indicated exceedingly mild
> disease.  Therefore Dr. Nicholson's assessment
> that the disease was present for several years is
> not totally inconsistent with the evidence, but
> his conclusion as to severity is not supported by
> objective medical evidence.

Tr. 16.

Disability determinations are reserved for the
Commissioner.  20 C.F.R. § 404.1527(e).  Dr. Nicholson's
assessment, however, is consistent with the comments made by
Drs. Cobasko and Ginocchio regarding Wray's earlier symptoms that
were later attributed to her multiple sclerosis and is compatible
with the standard for determining the onset date for progressive
diseases.

The Court, therefore, concludes on this record that the
ALJ erred when she failed to give legally sufficient reasons
supported by substantial evidence in the record for rejecting
Dr. Nicholson's opinion in light of the medical record in its
entirety.

### 5.    Evaluation by Oregon Health Sciences University Multiple Sclerosis Clinic

Wray also sought treatment at the Oregon Health Sciences University (OHSU) Multiple Sclerosis Clinic.  Tr. 331-33.  The ALJ, however, did not address the OHSU clinic's report.

Vijayshree Yadav, M.D., a neurologist at OHSU, evaluated Wray on April 24, 2003.  Dr. Yadav first noted Wray had "nonspecific symptoms early on, about 8-9 years ago, which included gradual onset of exhaustion and depression."  Tr. 331.  Dr. Yadav also noted Wray's report that she had frequent headaches and neck stiffness, episodic right leg and face numbness, and dizziness prior to her December 2001 referral to Dr. Cobasko.  Tr. 331.  Dr. Yadav considered these symptoms part of Wray's multiple sclerosis.

A specialist's opinion is accorded significant weight.  20 C.F.R. § 404.1527(d)(5).  The Court, therefore, finds the ALJ erred when she failed to provide legally sufficient reasons supported by substantial evidence in the record for not considering Dr. Yadav's report that Wray's multiple sclerosis symptoms preceded her September 30, 2000, date last insured.

**6.   William L. DeBolt, M.D., Medical Expert**

The ALJ requested Dr. DeBolt, a neurologist who did not treat Wray, to appear at Wray's hearing as a medical expert.  Tr. 396.  The ALJ assessed Dr. DeBolt's testimony as follows:

> [T]he medical expert was called upon to testify.
> In his testimony, the medical expert stated that

there was no evidence of any symptoms or signs of
any medically determinable impairment that would
have meet [*sic*] or equaled any disorder in any
section of Appendix 1 on or before September 30,
2000.  The medical expert testified the claimant's
symptoms were transient in nature and did not last
for twelve continuous months and that there was no
objective evidence of any significant limitations
on or before August 2001, as opined by the
treating physician.  The medical expert noted that
the limitations opined by Dr. Nicholson were based
on subjective complaints and not objective
findings.

Tr. 16.

Dr. DeBolt asserted he is familiar with the Social
Security "listings" and stated Wray first met the listing for
multiple sclerosis based on her gait disturbance in April 2002.
Tr. 405.  The ALJ asked whether there was a "way to tell whether
or not that those [*sic*] white matter lesions appeared
instantaneously" on the January 2001 MRI.  Dr. DeBolt replied the
lesions "could have been" present earlier, and "people with MS
can have those white matter lesions and do very well."  Tr. 405.
Dr. DeBolt's opinion, however, does not incorporate Wray's
symptoms as noted by her treating physicians.

As to Wray's reports of fatigue, Dr. DeBolt opined:

Fatigue is a difficult issue in the case of
multiple sclerosis.  And although she had symptoms
of fatigue, the listing requirements mean – insist
– the defect observable objective defect of
function be fatigue and then remiss [*sic*].  Now,
University of Oregon Medical School providence
[*sic*] have testing protocols, which evaluate this.
They take the person who is complaining of

> fatigue, do – make them work and then see how much
> their neurological condition has deteriorated.
> And it – the purpose of that is to document
> fatigue ability [sic] in the sense that the Social
> Security listing requires.  Twenty years ago we
> would put the person in a sauna or heat them up
> and abnormal neurological findings would appear
> and then recede as their temperature dropped.  The
> problem is that's not considered correct any
> longer because sometimes those things did not
> recede and they were left with permanent defects,
> so we don't do that anymore, so the exercise
> demonstration of abnormal neurological findings
> that then recede when the exercise is gone is now
> the standard way
> that we document fatigue ability [*sic*] in the
> sense of the Social Security listings.

Tr. 399-400.  Dr. DeBolt also noted the testing that he described

was not done and that "many factors" other than multiple

sclerosis (most notably depression) could account for Wray's

reported fatigue.  Tr. 400.  Dr. DeBolt also cites outmoded

testing protocol and suggests Wray's reported fatigue cannot

constitute a supportable symptom because it is "possible to

measure [fatigue] objectively."  Tr. 430.

Dr. DeBolt's analysis does not comply with the

relevant standards for evaluating a claimant's reports of

fatigue.  For example, the Ninth Circuit has found fatigue is

by nature a subjective symptom.  *Smolen v. Chater*, 80 F.3d 1273,

1281 (9th Cir. 1996).  In addition, when a claimant shows an

underlying impairment, the ALJ must consider the claimant's

subjective reports of fatigue absent a finding of malingering.

18  -  OPINION AND ORDER

*Smolen*, 80 F.3d at 1281.

Dr. DeBolt also stated Wray's multiple sclerosis is "mild," that "it would not appear that [Wray] has a severe case," and that her symptoms are "transient."  Tr. 401, 405. Dr. DeBolt's statements again contradict those of Wray's treating physicians.  For example, Drs. Cobasko and Ginocchio found Wray's condition was progressive and more than mild.  In addition, impairments that have symptom-free periods or "transient" symptoms may produce work-related limitations.  *Reddick*, 157 F.3d at 724.

The ALJ asked Dr. DeBolt whether he considered Wray's statements regarding her symptoms as "reasonable," and Dr. DeBolt responded that they were.  Tr. 429.  In his opinion, however, the ALJ states Dr. DeBolt reported:  "[T]here was no objective evidence of any significant limitations on or before August 2001."  Tr. 16.  The ALJ subsequently "considered the claimant's testimony and . . . found it inconsistent with the record as a whole.  Objective findings as noted . . .  with the opinions and testimony of the medical expert reveals the claimant did not suffer from any severe mental or physical impairment." Tr. 16.

Finally, Dr. DeBolt opined Wray's testimony that

she required rest when performing daily activities, specifically
caring for her children, was not indicative of significant
fatigue because such activities are "hardly work."  Even though
daily activities inconsistent with alleged disability may support
a negative credibility finding, sporadic completion of daily-
living activities are not equivalent to full-time employment.
*See Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).  A
claimant "need not vegetate in a dark room," to be found
disabled.  *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987).  In
addition, such vocational speculation is the province of a
vocational expert rather than a medical expert.  *Tackett*, 180
F.3d at 1102.

        In summary, the testimony of Dr. DeBolt, a
nontreating physician, includes conclusions that are contrary to
Social Security regulations, Ninth Circuit law, and the opinions
of Wray's treating physicians.  The Court, therefore, finds the
ALJ erred when he relied on Dr. DeBolt's testimony as a basis for
rejecting the opinions of Wray's treating physicians.  *See
Lester*, 81 F.3d at 831.

    **C.    ALJ's Conclusions at Step Two**

    An impairment may be considered to be severe if it lasts
twelve continuous months, if it is expected to last twelve
consecutive months or longer after the onset date, or if it is

20  -  OPINION AND ORDER

expected to result in death.  20 C.F.R. §§ 404.131, 404.1509.
Thus, the ALJ's repeated statement that an impairment must last
"twelve continuous months" prior to a claimant's onset date is
erroneous.  *See* Tr. 15-17.  In addition, an impairment that
produces "waning and waxing" symptoms may be found to be severe.
*Reddick*, 157 F.3d at 724.

    Based on Dr. DeBolt's contradicted opinion, the ALJ found
Wray's impairment to be nonsevere.  The ALJ, however, erred when
he relied on Dr. DeBolt's opinion as a basis for rejecting the
opinions of Wray's treating physicians, for determining that
Wray's testimony was not credible, and for speculating about
Wray's potential vocational performance.  As noted, credibility
determinations and vocational opinions regarding nonexertional
impairments are respectively the province of the ALJ and a
vocational expert rather than a medical expert.

    In summary, the Court notes diagnostic testing was initiated
within 3 1/2 months of Wray's date last insured.  The medical
evidence submitted by Wray's treating and examining physicians
indicates Wray had symptoms before initiation of diagnosis.  As
noted, "[t]he onset date should be set on the date when it is
most reasonable to conclude from the evidence that the impairment
was sufficiently severe to prevent the individual from engaging
in SGA (or gainful activity) for a continuous period of at least

21   -   OPINION AND ORDER

12 months or result in death." SSR 83-20 (1983 WL 31249, at *3).
In addition, consideration of reports made after a date last
insured are relevant to evaluation of a "pre-expiration"
condition. *Smith*, 849 F.2d at 1225.

For these reasons, the Court concludes the ALJ erred in his
findings at Step Two regarding Wray's multiple sclerosis,
migraine headaches, and depression.

## II. Credibility of Wray's Testimony

### A.    Credibility Analysis Generally

The ALJ's credibility findings must be "sufficiently
specific to permit the reviewing court to conclude that the ALJ
did not arbitrarily discredit the claimant's testimony." *Orteza
v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995). The ALJ may not
make a negative credibility finding after a claimant shows an
underlying impairment "solely because" the claimant's symptom
testimony "is not substantiated affirmatively by objective
medical evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880,
883 (9th Cir. 2006). When making credibility findings, the ALJ
may consider objective medical evidence and the claimant's
treatment history, including any failure by the claimant to seek
treatment as well as the claimant's daily activities, work
record, and observations of physicians and third parties with
personal knowledge of the claimant's functional limitations.

*Smolen*, 80 F.3d at 1284.  In addition, the ALJ may employ
ordinary techniques of credibility evaluation such as weighing
inconsistent statements regarding symptoms by the claimant.  *Id.*

**B.  Discussion**

The ALJ found "[t]he claimant's statements concerning her
limitations and their impact on her ability to work are not
credible in light of the objective medical evidence and the
testimony of the medical expert, as set forth in the body of the
decision."  Tr. 17.  The ALJ did not offer any evaluation of
Wray's symptom testimony other than noting Dr. DeBolt's opinion
that "there was no evidence of any symptoms or signs" of any
medically determinable impairment that would meet or equal a
listed disorder "on or before September 30, 2000."  Tr. 17.

The Court notes the ALJ cautioned Wray at the beginning of
the January 4, 2005, hearing that "[w]hat you tell me about your
problems I will listen to but the medical evidence is what
controls this case.  I must find that anything you tell me is
reasonably consistent with the documented evidence.  And if it is
not then I cannot accept that in making my Determination as to
your capacity."  Tr. 394.  The ALJ also informed Wray's counsel
that she first wanted Dr. DeBolt to "interpret the record as it
is," and "we'll see what he says and then take testimony from her
and more testimony from him if we need it."  Tr. 395.  This

approach contravenes the established purpose of such hearings. *See* 20 C.F.R. § 404.944.  Finally, before hearing Wray's testimony, the ALJ told Wray's attorney that "I sincerely doubt you're going to be successful.  If you want I will let [Dr. DeBolt] listen to her testimony."  Tr. 406.

After a claimant establishes the existence of a medically determinable impairment, the ALJ must consider the claimant's symptom testimony.  *Smolen*, 80 F.3d at 1280.  The claimant must provide "objective medical evidence of an underlying impairment 'which could reasonably be expected to produce pain or other symptoms alleged . . . .'"  *Id.* (internal citations omitted).  Such a causal relationship need only be based on a "reasonable inference, not a medically proven phenomenon."  *Id.* at 1281.  The Smolen court noted:

> The ALJ focused on whether Smolen's impairments could have caused the severity of fatigue Smolen alleged; however, Smolen only had to prove that her impairments could reasonably have caused *some degree* of fatigue . . . no more was required.  Finally, the ALJ erroneously focused upon whether the causal relationship was medically determinable through scientific studies, instead of whether it was reasonable to expect such a relationship.

*Smolen*, 80 F.3d at 1283 (internal citations omitted; emphasis in original).  The ALJ made the same error here.

If the ALJ rejects the claimant's symptom testimony absent a finding of malingering, she must offer "specific, clear and

24  -  OPINION AND ORDER

convincing reasons" to support her conclusion. *Id.* The ALJ's reasons may not be based on medical evidence only. *Robbins*, 466 F.3d at 833. When an ALJ finds a claimant's symptom testimony is not credible because a medical expert rejected the claimant's testimony and the opinions of the claimant's treating physicians, the ALJ errs if he fails to satisfy the established standards for evaluating both medical evidence and claimant credibility. *Lester*, 81 F.3d at 831. *See also Smolen*, 80 F.3d at 1284; *Robbins*, 466 F.3d at 833. The Court, therefore, concludes the ALJ erred when she failed to provide legally sufficient reasons supported by substantial evidence in the record for finding Wray's testimony was not credible.

## III. Credibility of Lay-Witness Testimony

### A.   Analysis

The ALJ has a duty to consider lay-witness testimony. 20 C.F.R. §§ 404.1513(d), 404.1545(a)(3). *See also Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). Friends and family members in a position to observe the claimant's symptoms and daily activities are competent to testify regarding the claimant's condition. *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993). The ALJ may not reject such testimony without comment, but he may reject lay testimony that is inconsistent with medical evidence in the record. *Nguyen v. Chater*, 100 F.3d 1462, 1467

(9th Cir. 1996).  *See also Lewis*, 236 F.3d at 512.  If an ALJ

rejects lay-witness testimony entirely, he must give reasons

germane to the witness.  *Nguyen*, 100 F.3d at 1467.  Silent

omission of lay-witness testimony regarding a claimant's ability

to function in a work environment is not harmless.  *Stout v.*

*Comm'r*, 454 F.3d 1050, 1055-56 (9th Cir. 2006).

**B.    Nurse Practitioner Kim Tinker**

Wray contends the ALJ failed to consider the opinion of

Nurse Practitioner Kim Tinker.  As an "other" source, the ALJ

must evaluate Tinker as a lay witness.  *See* 20 C.F.R.

§ 404.1513(d).

In May 2004, Tinker submitted a letter for the record in

which she stated Wray reported symptom onset in 1992 and

> [d]uring the years between the onset of her symptoms
> [in 1992] and diagnosis [in 2002] and since Chloe has
> not been able to hold down a job and even struggled
> with caring for her own children and household.  She
> often had episodes when she had difficulty mentating,
> overwhelming fatigue, headache, and chronic pain.  When
> she did try and push past the symptoms and carrying
> [sic] on normal activities this would cause her to have
> even more of a set back.  Once again between 2001-2002
> she attempted to work as a home assistant to an elderly
> couple.  She worked a few hours a day but found she
> often had to call in sick due to her own problems.
> Eventually she had to even this up.
>
> At this time Chloe's condition is very fragile and her
> MS has not responded to any treatments tried.  She is
> rapidly approaching the point where she herself will
> soon need assistance for daily living.

Tr. 304.

The ALJ found "Ms. Tinker did not identify any objective evidence reasonably expected to result in specific functional limitations, or identify any specific functions or activities the claimant has been unable to perform on a sustained basis to support [her] conclusion the claimant has been unable to work since 1995." Tr. 16. The ALJ, however, did not provide a reason germane to Tinker for discrediting her testimony.

The Court, therefore, finds the ALJ erred when she failed to provide legally sufficient reasons supported by substantial evidence in the record for discrediting Tinker's testimony.

**IV.  Remand**

The Court has discretion to remand for further proceedings or for immediate payment of benefits. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision. *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989). Thus, evidence improperly rejected by the ALJ should be credited as true and an immediate award of benefits directed when "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no

outstanding issues that must be resolved before a determination
of disability can be made, and (3) it is clear from the record
that the ALJ would be required to find the claimant disabled were
such evidence credited." *Harman*, 211 F.3d at 1178 (citing
*Smolen*, 80 F.3d at 1292).  When it is not clear whether the ALJ
would be required to award benefits if the improperly rejected
evidence were credited, the Court has discretion as to crediting
the evidence.  *See Connett v. Barnhart,* 340 F.3d 871, 876 (9th
Cir. 2003).

Here the ALJ improperly rejected the opinions of Wray's
treating and examining physicians:  Drs. Cobasko, Ginocchio,
Nicholson, and Yadav.  The ALJ also erroneously found Wray's
testimony and the testimony of Nurse Practitioner Kim Tinker to
be not credible.  Even if credited, however, this evidence would
not clearly establish Wray's disability because the testimony of
a vocational expert was not solicited regarding Wray's
limitations, her ability to perform her previous work, or her
ability to work at jobs available in the national economy.  Thus,
the Court concludes further proceedings are necessary for the ALJ
to make proper findings at Step Three; proper evaluation of the
opinions of Drs. Cobasko, Ginocchio, and Nicholson; and
determinations at Steps Four and Five if necessary.  The Court
notes a claimant's impairments may be found severe in

combination, and the ALJ must include relevant symptom testimony when evaluating the claimant's RFC before making determinations at Steps Four and Five.

In summary, the Court finds on this record that it is necessary to remand this matter for further administrative proceedings.

## <u>CONCLUSION</u>

For these reasons, the Court **REVERSES** the Commissioner's decision that Wray is not disabled and is not entitled to benefits under Title II of the Social Security Act.  Accordingly, the Court **REMANDS** this matter for further proceedings consistent with this Opinion and Order.

IT IS SO ORDERED.

DATED this 9th day of April, 2007.


/s/ Anna J. Brown
_____
ANNA J. BROWN
United States District Judge